812 F.2d 243
 ALLSEAS MARITIME, S.A., et al., Plaintiffs,
v.
M/V MIMOSA, etc., et al., Defendants.
JUNIPER SHIPPING LTD., Defendant-Appellant Cross-Appellee,
v.
VIZIER OFFSHORE TOWING, Tommie Vizier, Russell Duet, Joseph
Basaldu, Lloyd Duet and Ronald Paul Taylor,
Claimants-Appellees Cross-Appellants.
CROWNCEN INTERNATIONAL, N.V., Plaintiff,
v.
ALLSEAS MARITIME, S.A., et al., Defendants.
JUNIPER SHIPPING, LTD., Defendant-Appellant, Cross-Appellee,
v.
VIZIER OFFSHORE TOWING, et al., Claimants-Appellees,
Cross-Appellants.
ALLSEAS MARITIME, S.A., et al., Plaintiffs,
v.
STATE OF TEXAS, et al., Defendants.
JUNIPER SHIPPING, LTD., Defendant-Appellant, Cross-Appellee,
v.
VIZIER OFFSHORE TOWING, et al., Claimants-Appellees,
Cross-Appellants.
In the Matter of the Complaint of JUNIPER SHIPPING, LTD.,
etc., Plaintiff- Appellant, Cross-Appellee.
v.
VIZIER OFFSHORE TOWING, et al., Claimants-Appellees, Cross-Appellants.
 No. 86-2093.
 United States Court of Appeals,
Fifth Circuit.
 March 13, 1987.
 
 Howard M. McCormack, New York City, James G. Blain, Royston, Rayzor, Vickery & Williams, Houston, Tex., for defendant-appellant cross-appellee.
 James Hanemann, Jr., New Orleans, La., Thomas A. Brown, Brown, Sims & Ayre, Houston, Tex., for Vizier Offshore Towing, Inc. et al.
 Appeals from the United States District Court for the Southern District of Texas.
 Before GOLDBERG, RUBIN, and POLITZ, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 After a collision between two vessels in Galveston Bay, one of the ships steamed out of control, threatening to strike nearby oil rigs and platforms. Three tugboats guided the vessel into an open area, where, with the assistance of a fourth tug, they saved the errant vessel. Only the salvor who directed the operation filed a salvage-award claim. The district court found that the claimant salvor was twenty-five percent responsible for the rescue but awarded to it alone an amount that was more than twenty-five percent of the salvage value of the vessel. We therefore reduce the salvage award on the bases that the value saved to the owner is the maximum allowable award and the amount awarded was disproportionate when that maximum and other relevant factors are taken into account. We agree, however, with the district court that the amount of the award should not reflect an allowance for the avoidance of liability for damage to the oil rigs and platforms because the vessel owner's liability was limited to the salvage value of the vessel. Because the salvor did not prove ownership by the defendant of the fuel oil recovered from the vessel, we reject its claim that the salvage award should reflect the value of the oil.
 
 I.
 
 2
 While sailing from the port of Houston outside Galveston Bay, the M/V MIMOSA collided with the M/V BURMA AGATE in November 1979. All but four members of the AGATE were killed as was one person on the MIMOSA. In addition, a substantial amount of fuel leaked from the BURMA AGATE. The MIMOSA caught fire, and its crew abandoned ship after dropping anchor. Because the engine was left running and the rudder turned to starboard, the MIMOSA steamed in ever-widening circles causing it to approach nearby oil drilling rigs and platforms.
 
 
 3
 The captain of a tugboat anchored at Galveston, the M/V TAROZE VIZIER, perceived the danger, left the harbor, and maneuvered toward the MIMOSA to salvage it. The captain of the TAROZE VIZIER tried to stop the MIMOSA by entangling its propeller with rope and cable. This created a risk that the tug might slip into the MIMOSA's propeller and be seriously damaged. The tug's crew worked beneath the main area of the MIMOSA's fire amidst a great deal of smoke. At one point, parts of a lifeboat fell from the MIMOSA onto the TAROZE VIZIER. According to an engineer on the tugboat, "it was just like working underneath a Roman candle."
 
 
 4
 While the efforts to stop the MIMOSA's propeller did not halt the engine, the TAROZE VIZIER, along with two other tugs, pushed the MIMOSA into an open area, away from the oil drilling rigs. A fourth tug joined the salvage effort, helping to douse the fire on board the MIMOSA. Approximately seven and one-half hours after the collision, the MIMOSA's engines stopped; a few hours later, the Coast Guard released the TAROZE VIZIER.
 
 
 5
 Numerous claims were filed as a consequence of the collision. Representatives of the decedent crew members sued the owners of the MIMOSA and BURMA AGATE as did owners of the cargo oil carried by the BURMA AGATE. Each vessel owner filed a petition for exoneration from or limitation of liability. Various claims and cross-claims were filed in the liability proceedings, including a claim for a salvage award by the TAROZE VIZIER. None of the other three salvors sought an award. All of the actions were ultimately consolidated and each of the claims was separately resolved until the sole remaining claim was the TAROZE VIZIER's claim for salvage.
 
 
 6
 After a bench trial, the district court assessed the value of the salvaged MIMOSA at $400,000 and the value of the TAROZE VIZIER at $2.6 million. It found that "the TAROZE VIZIER and her crew were endangered by the MIMOSA's fire, smoke, debris, and possible explosions," and that the attempts to stop the propeller "seriously endangered the tug with sinking" and its "crew with personal injury." The court observed that the captain of the TAROZE VIZIER successfully directed the efforts to steer the MIMOSA away from the oil rigs and platforms.
 
 
 7
 The court concluded that the TAROZE VIZIER was "25% responsible for the rescuing of the MIMOSA--thus saving the defendant $100,000." Instead of limiting the award to "a strict quantum meruit measure of the[ ] ... value to the defendant," the court added a $50,000 premium because of "factors such as the risk and skill involved" in the salvage efforts and made a total award of $150,000. In its conclusions of law, the court listed the main factors considered in determining the amount of the award:
 
 
 8
 "(a) the degree of danger from which the salvaged property was saved;
 
 
 9
 (b) the salvaged property's value;
 
 
 10
 (c) the risk incurred by the salvors;
 
 
 11
 (d) the salvors' promptitude, skill, and energy;
 
 
 12
 (e) the value of the salvors' property put at risk, and(f) the salvors' time and labor."
 
 
 13
 The MIMOSA seeks a reduction in the salvage award. The TAROZE VIZIER, on cross-appeal, faults the district court for not basing the award on the value of fuel oil, worth $350,000, carried by the MIMOSA. The TAROZE VIZIER also contends that the court should have taken into account the fact that, had the MIMOSA struck the oil rigs, it might have been held liable for millions of dollars of damage.
 
 II.
 
 14
 No precise formula has been, or can be, described for calculating salvage awards.[1] Instead, the trial court must evaluate each case according to its circumstances, applying the six well-established considerations that the district court set forth in its conclusions of law.[2] These factors guide the trial court in fulfilling the public policy behind salvage awards of encouraging seamen to render prompt service during maritime emergencies.[3] In order to provide sufficient incentive for seamen to undertake the risks of salvage, awards are not limited to a strict quantum meruit; instead, they are more in the nature of a bounty.[4] For these reasons, the amount allowed as a salvage award must be decided on a fact-specific basis by the district court. In recognition of this, our opinions state that the amount allowed is to be decided by the district court in its sound discretion and an award will be altered only if it was based upon incorrect principles of law or misapprehension of the facts or it is either so excessive or so inadequate as to indicate an abuse of discretion.[5]
 
 
 15
 The MIMOSA contends that the TAROZE VIZIER's efforts to jam the MIMOSA's propeller were not successful and should not be considered in the award calculation. It is true that courts reward salvors only when property of value is saved.[6] Whatever the actual contribution of the jamming efforts to the success of the rescue, however, the TAROZE VIZIER undertook the risk of attempting them in good faith. We agree with the Ninth Circuit that a successful salvage should be viewed as an entirety, not on an act-by-act basis. To dissect a multi-faceted salvage operation and decide how risky and how successful each particular effort was would entail unreasonable speculation by the courts.[7]
 
 
 16
 In one respect, the district court departed from the rules governing salvage awards. As the name of the award indicates, it is given to reward the salvor for saving something for the owner. The salvage award is therefore limited by the value of the property saved after all of the appropriate factors are taken into account including risk to the salvor. Otherwise, the award would not serve the goal of ensuring that salvage efforts benefit the owners of salvaged vessels.[8] When the district court concluded that the TAROZE VIZIER was 25% responsible for the MIMOSA's salvage, then, it effectively set a limit against which the TAROZE VIZIER's award should be measured at 25% of $400,000, or $100,000. Even though none of the other salvors entered a claim, their generosity inures to the MIMOSA[9] and does not enhance the bounty of the TAROZE VIZIER. In increasing its base award of $100,000 by $50,000 for the risk undertaken, the district court not only added a reward for a factor that should already have been considered in computing the award, but also reached a sum that far exceeded the maximum allowable.
 
 
 17
 When a court of appeals finds a salvage award excessive, it may modify the award accordingly.[10] Although the award was too high, the district court's findings of fact indicate that the TAROZE VIZIER earned a handsome reward. The TAROZE VIZIER, valued at $2.6 million, was exposed to serious risk, responded first to the emergency, and directed the other tugs. Moreover, the tug "resourcefully" attempted to stop the MIMOSA's engines. The MIMOSA would "most likely have been destroyed" if it had struck an oil rig or platform. Considering these facts and the $100,000 saving to the MIMOSA's owner attributable to the TAROZE VIZIER, an award of two-thirds that amount, $67,500, seems to us to be both generous to the salvor and fair to the MIMOSA's owner. We therefore reduce the district court's award to $67,500.
 
 III.
 
 18
 The TAROZE VIZIER faults the district court for not considering the potential damage to oil rigs and platforms off Galveston avoided by its efforts. As the TAROZE VIZIER recognizes, traditional salvage law does not reward a salvor for saving the shipowner from liability for damages to other ships, oil rigs, or other nearby property.[11] There is considerable merit, nonetheless, in the position that salvors should be compensated for liability avoided. Whether the salvor protects a shipowner's vessel or his other assets, the economic benefits are equally valuable. Because of the Limitation of Liability Act of 1851,[12] however, the salvor did not save the owner of the MIMOSA from loss of other assets. The Act ordinarily limits liability of a shipowner for damages caused by his vessel to the value of the vessel unless a basis for personal liability is established.[13] Thus, even though the MIMOSA might have caused millions of dollars of damage to nearby oil rigs, its owner could not have been required to pay more than the salvage value of the MIMOSA. Had the MIMOSA not been salved, but crashed into a rig, the owner would still have lost only the value of the MIMOSA, and that averted loss is already considered in the salvage award calculation.
 
 
 19
 While the owner of the MIMOSA might not have benefited from the avoidance of damage to third parties, the third parties surely did, and the salvor's contribution should be recognized. Nevertheless, Congress has chosen to limit a vessel owner's responsibility for third-party damage to the value of his vessel. An harmonious chorus--including justices of the Supreme Court,[14] this circuit,[15] and academic writers[16]--has criticized the anachronistic survival of the Limitation of Liability Act. At one time, vessel owners may have needed special protection from liability so they could compete with British shippers who already enjoyed limited liability.[17] But, whatever we might choose today were the decision ours, we are bound by the choice of Congress.
 
 
 20
 In its "Claim and Answer" to the district court, the TAROZE VIZIER challenged the MIMOSA's petition to limit liability. A shipowner may not limit liability for an accident when it has knowledge or privity of negligence or unseaworthiness by its vessel that caused the accident,[18] and, at oral argument, the TAROZE VIZIER justified its opposition on the ground that the MIMOSA had employed a substandard master.
 
 
 21
 While the MIMOSA bears the burden of proving lack of privity or knowledge, the TAROZE VIZIER bears the initial burden of proving negligence or unseaworthiness.[19] We have, therefore, reviewed the entire transcript of the trial and have found that the TAROZE VIZIER introduced no evidence that the owners of the MIMOSA were negligent or had knowledge of the vessel's unseaworthiness. Indeed, there was no evidence of fault, with or without the owner's knowledge. The district court made no finding on the question and apparently was not requested to do so. Consequently, the TAROZE VIZIER did not bear its burden of proof and cannot now urge us to disregard the limitation of liability.
 
 IV.
 
 22
 The TAROZE VIZIER contends that the salvage value of the MIMOSA should have included $350,000 worth of fuel oil carried on board. The saving of cargo, fuel, or other property on the salved vessel is a salvage service that merits compensation in the same way as does the saving of the vessel itself, and anyone with a direct pecuniary interest in the property may be held liable for the award.[20] The district court found that the TAROZE VIZIER "failed to prove that [the owner of the MIMOSA] had any interest in th[e] fuel." According to the TAROZE VIZIER, however, the district court misallocated the burdens of proof: the TAROZE VIZIER asserts that fuel on board a vessel presumably belongs to the owner of the vessel.
 
 
 23
 While presumptions shift the burden of producing evidence, there was disagreement over their effect on the ultimate burden of proof, the burden of persuasion, before adoption of the Federal Rules of Evidence.[21] According to the "bursting-bubble" theory, once rebuttal evidence was introduced, a presumption simply disappeared from the case. Under a second theory, a rebutted presumption still shifted the burden of proving the nonexistence of the presumed fact.[22] At least three circuits, including this one, have concluded that Federal Rule of Evidence 301[23] adopted the bursting-bubble view of presumptions.[24] An exception to this application of Rule 301 occurs when "the facts with regard to an issue lie peculiarly in the knowledge of one party," and it would therefore be "particularly onerous" to require the other party to bear the burden of persuasion on the issue.[25] The TAROZE VIZIER has not suggested that ownership of fuel oil is such an issue.
 
 
 24
 At trial, the TAROZE VIZIER introduced evidence bearing on the value of the fuel oil but not on its ownership. A witness for the MIMOSA, on the other hand, testified that the fuel belonged to the charterer, not the owner, of the MIMOSA. Assuming, without deciding, that there was a presumption of ownership by the MIMOSA, the testimony was sufficient to meet the MIMOSA's burden of producing evidence, thereby eliminating the presumption from the case. Consequently, the district court's finding that the TAROZE VIZIER failed to meet its burden of persuasion was not clearly erroneous. The TAROZE VIZIER contends, however, that, in a proceeding to limit liability, the owner of a vessel bears the burden of persuasion regarding the value of its vessel. This argument misses the point. The owner's ability to limit liability is a different question from the salvor's claim for an award. When salvage claims are asserted, the salvor bears the burden of persuasion regarding salvage value.[26]
 
 
 25
 For the reasons stated, we REDUCE the district court's salvage award from $150,000 to $67,500 and direct that judgment be entered in that sum.
 
 
 
 [1]
 3A M. Norris, Benedict on Admiralty Sec. 236 (7th ed. 1983)
 
 
 [2]
 The Blackwall, 77 U.S. (10 Wall.) 1, 14, 19 L.Ed. 870 (1869); Platoro Ltd. v. The Unidentified Remains of a Vessel, Her Cargo, Apparel, Tackle, and Furniture, in a Cause of Salvage, Civil and Maritime, 695 F.2d 893, 904 n. 16 (5th Cir.), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); 3A M. Norris, supra note 1, Sec. 237
 
 
 [3]
 G. Gilmore & C. Black, The Law of Admiralty Sec. 8-10, at 532 (2d ed. 1975)
 
 
 [4]
 B.V. Bureau Wijsmuller v. United States, 702 F.2d 333, 338 (2d Cir.1983); 3A M. Norris, supra note 1, Sec. 235
 
 
 [5]
 Platoro, 695 F.2d at 903; Compania Galeana, S.A. v. Motor Vessel Caribbean Mara, 565 F.2d 358, 360 (5th Cir.1978); 3A M. Norris, supra note 1, Sec. 311
 
 
 [6]
 Wijsmuller, 702 F.2d at 338; Note, Calculating and Allocating Salvage Liability, 99 Harv.L.Rev. 1896-97 (1986)
 
 
 [7]
 Saint Paul Marine Transportation Corp. v. Cerro Sales Corp., 505 F.2d 1115, 1121 (9th Cir.1974)
 
 
 [8]
 Platoro, 695 F.2d at 904; G. Gilmore & C. Black, supra note 3, Sec. 8-10, at 563
 
 
 [9]
 Platoro, 695 F.2d at 903
 
 
 [10]
 W.E. Rippon & Son v. United States, 348 F.2d 627, 629 (2d Cir.1965); 3A M. Norris, supra note 1, Sec. 315
 
 
 [11]
 Westar Marine Services v. Heerema Marine Contractors, S.A., 621 F.Supp. 1135, 1140-41 (N.D.Cal.1985)
 
 
 [12]
 46 U.S.C. Secs. 183-88 (1982)
 
 
 [13]
 46 U.S.C. Sec. 183(a) (1982)
 
 
 [14]
 Maryland Casualty Co. v. Cushing, 347 U.S. 409, 437, 74 S.Ct. 608, 623, 98 L.Ed. 806 (1954) (Black, J., dissenting)
 
 
 [15]
 Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1376 (5th Cir.1983) (en banc); University of Texas Medical Branch v. United States, 557 F.2d 438, 441 (5th Cir.1977), cert. denied, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978)
 
 
 [16]
 G. Gilmore & C. Black, supra note 3, Secs. 10-4, 10-4(a), and 10-13
 
 
 [17]
 Continental Oil Co., 706 F.2d at 1375-76
 
 
 [18]
 Farrell Lines, Inc. v. Jones, 530 F.2d 7, 10 (5th Cir.1976)
 
 
 [19]
 Id. at 10
 
 
 [20]
 San Francisco Bar Pilots v. The Vessel Peacock, 733 F.2d 680, 682 (9th Cir.1984)
 
 
 [21]
 In re Yoder Co., 758 F.2d 1114, 1119 (6th Cir.1985)
 
 
 [22]
 Id
 
 
 [23]
 Fed.R.Evid. 301 states in part:
 [A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.
 
 
 [24]
 Pennzoil Co. v. Federal Energy Regulatory Commission, 789 F.2d 1128, 1137 n. 24 (5th Cir.1986); Yoder, 758 F.2d at 1119-20; Legille v. Dann, 544 F.2d 1, 6-7 (D.C.Cir.1976)
 
 
 [25]
 Trans-American Van Service, Inc. v. United States, 421 F.Supp. 308, 331 (N.D.Tex.1976)
 
 
 [26]
 Nolan v. A.H. Basse Rederiaktieselskab, 267 F.2d 584, 589 (3d Cir.1959)